**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| RIVER BIRCH CAPITAL, LLC, | : | |
| | : | |
| Plaintiff, | : | **Civil Action No.** |
| | : | |
| v. | : | |
| | : | |
| JACK COOPER HOLDINGS CORP., | : | |
| T. MICHAEL RIGGS and MICHAEL | : | |
| TESTMAN. | : | |
| | : | |
| Defendants. | : | |
| | x | |

## COMPLAINT

River Birch Capital, LLC ("Plaintiff"), by its undersigned counsel, alleges:[1]

## I.
## INTRODUCTION

1.     This is an action seeking damages against Jack Cooper Holdings Corp. ("Jack Cooper") for its violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against certain individuals who are owners, officers, and/or directors of Jack Cooper under section 20(a) of the Exchange Act.

2.     Jack Cooper, at all relevant times, was the largest transporter of light-vehicles in North America.   At all relevant times, Jack Cooper's three largest customers were General

---

[1] Plaintiff's  allegations are made upon information and belief, except as to those specific allegations set forth herein, which are alleged upon Plaintiff's personal knowledge.  Plaintiff's allegations are based on, among other things, a review and analysis of: (i) public filings by Jack Cooper with the SEC; (ii) information included on Jack Cooper's investor portal prior to its bonds being registered with the SEC; (iii) notes from investor meetings and conference calls with Jack Cooper's senior management and/or counsel; (iv) press releases and other public statements issued by Jack Cooper; (v) research reports and news articles authored by securities and financial analysts; (vi) analyses of securities movement and pricing data; (vii) the knowledge of Plaintiff's employees and agents; and (viii) other publicly available information relating to Jack Cooper and its bonds.

Motors, Ford, and Toyota, which accounted for 40%, 31% and 12% of Jack Cooper's revenues, respectively, for the year ended December 31, 2015.[2]  For years, Jack Cooper touted, as its major strength, its longstanding, unwavering customer relationships and its long-term contracts with such customers.[3]

3.     Plaintiff purchased Jack Cooper's 9.25% Senior Secured Notes due 2020 (the "Notes") in June and July of 2016 in reliance on Jack Cooper's assurances of its stable and long-term customer relationships.  Prior to purchasing the Notes, Plaintiff analyzed Jack Cooper's public financial information and disclosures and conducted diligence calls with Jack Cooper's CEO, Michael Riggs, who provided Plaintiff with additional assurances of Jack Cooper's entrenched relationship with its customers.

4.     When Plaintiff purchased the Notes, however, Jack Cooper failed to disclose that it faced significant business risks in that at least one of its three principal customers had the contractual right to terminate its long-term contract with Jack Cooper pursuant to a Debt/EBITDA ratio covenant (the "Covenant").  Jack Cooper never disclosed the existence of such Covenant.  Jack Cooper likewise knowingly failed to disclose that it was effectively, or would almost certainly be, in violation of such Covenant.

---

[2] *See, e.g.,* Jack Cooper's December 31, 2015 Form 10-K ("December 2015 10-K"), at p. 63.

[3] *See, e.g.,* Jack Cooper's Form S-4 dated April 11, 2016 ("April 2016 S-4"), at p. 84 ("We have developed and maintained long-term relationships with our significant customers and have historically been successful in negotiating contract renewals."); *see also* Jack Cooper's Prospectus dated May 12, 2016 ("May 2016 Prospectus"), at p. 84 (same).

5.      It was not until November 2, 2016, when Jack Cooper revealed that (i) one of its principal customer contracts contained the Covenant that, if breached, would allow the contract to be terminated, (ii) this same customer was threatening to terminate its contract at the end of 2016 because Jack Cooper would violate the Covenant due to its 10.66x Debt to EBITDA Ratio (the Covenant required a ratio of 3.3x at year-end), (iii) Jack Cooper had already lost a material amount of business from another one of its three largest customers based on debt concerns, and (iv) other customer losses could follow.

6.      The market's response to Jack Cooper's November 2, 2016 disclosure was swift and harsh.  The price of the Notes plummeted more than 20 points to 46.5 cents on the dollar as compared to 67.5 cents on the dollar just days earlier.  In the following days and weeks, the Notes traded as low as 34.75 cents on the dollar.[4]

7.      Had Jack Cooper and the Jack Cooper Individual Defendants (defined below) properly and timely disclosed the existence of the Covenant (as well as the loss of business from one or more of Jack Cooper's largest and supposedly intensely loyal long-term customers, and the general deterioration of its customer relationships), Plaintiff would not have purchased the Notes, and Plaintiff would not have incurred the losses complained of, and for which redress is sought, herein.

---

[4] For example, on November 30, 2016, the Notes traded at 34.75 cents on the dollar.

8.      Jack Cooper's failure timely to disclose the existence of the Covenant (and its known loss, or likely known loss of significant customer business due to the Covenant and/or other customer concerns about Jack Cooper) caused millions of dollars in bondholder value to be lost, inflicting substantial damage on Plaintiff. This lawsuit seeks compensation for such losses under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 20(a) of the Exchange Act.

## II.
## PARTIES

9.      Plaintiff, River Birch Capital, LLC, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

10.     Defendant Jack Cooper Holdings Corp. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Kansas City, Missouri.

11.     Defendant T. Michael Riggs is the chief executive officer of Jack Cooper and has held this position since August 2014.  Mr. Riggs is also the controlling shareholder of Jack Cooper (holding approximately 70% of outstanding voting securities as of May 2016), and he

has been a member of the board of directors, the president, and the treasurer of Jack Cooper since January 2010.

12.     Defendant Michael Testman was the chief financial officer of Jack Cooper between April 2010 and September 16, 2016, and he has been a member of the Jack Cooper board of directors since July 2010.

13.     Defendants Michael Riggs and Michael Testman are collectively referred to herein as the "Jack Cooper Individual Defendants."

### III.
### JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) and section 20(a) of the Exchange Act.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22 of the Exchange Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and (c). The acts and conduct complained of herein occurred, in part, in

this District, including material omissions in connection with communications to Plaintiff, which

maintains its principal place of business in New York, New York.

17.     In connection with the acts alleged in this Complaint, Jack Cooper used the means

and instrumentalities of interstate commerce including, without limitation, interstate mail and

telephone communications.

18.     Jack Cooper and the Jack Cooper Individual Defendants have sufficient contacts

within New York to make the exercise of jurisdiction over it by New York federal courts

consistent with traditional notions of fair play and substantial justice.

**IV.**
**FACTUAL BACKGROUND**

19.     Jack Cooper is a specialty transportation and logistics provider and the largest

over-the-road vehicle logistics company in North America.  Jack Cooper specializes in finished

vehicle transportation and other logistics services for major automotive original equipment

manufacturers ("OEMs") and for fleet ownership companies, remarketers, dealers and auctions.

At all times relevant, Jack Cooper's three largest customers were General Motors, Ford and

Toyota, which collectively account for approximately 80% of Jack Cooper's annual revenues.

20.     On June 18, 2013, Jack Cooper issued the Notes in the aggregate principal

amount of $225 million.  The Notes were issued pursuant to an Indenture, dated as of June 18,

2013, by and among Jack Cooper, certain guarantors, and U.S. Bank National Association, as

indenture trustee (the "Indenture").[5]

21.     In connection with the issuance of the Notes, Jack Cooper released an Offering

Memorandum, dated June 7, 2013,[6] wherein Jack Cooper lauded the critical services provided to

and ironclad long-term relationships with its customers, as follows:

- ***Company Overview***…We have consistent dialogue with our customers at multiple levels of their organization, which allows us to proactively respond to their evolving requirements and remain a critical component of their supply chains.  ***Customer switching is infrequent*** given the significant infrastructure and network capacity needed to meet the demanding transportation requirements of our customers.  As a result, ***we have long-term relationships with most of our customers***, including our three largest customers, GM, Ford, and Toyota, who we have served for 85, 20 and 34 years, respectively. . . . We have implemented a number of key operational initiatives including renegotiating customer contracts to secure favorable pricing[.][7]

- ***Long-term Relationships with Customers.*** Our customers include all of the major automotive OEMs including General Motors, Ford, Toyota, Chrysler, Nissan, Mazda, Hyundai/Kia and Honda.  We have multi-year contractual relationships with OEM customers that comprise 89% of the total U.S. automobile OEM market.  ***Due to the critical nature of the services we provide, customer switching is infrequent*** and, as a result, we have long-term relationships with our three largest customers, GM, Ford, and Toyota of 85, 20 and 32 years, respectively. . . .***We believe the long-term contractual relationships with our customers provide us with revenue visibility***.[8]

- ***Focus on Contractual Improvements.***  We believe that we will be able to continue to enter into new contracts and modify existing contracts that enhance our long-term profitability.  During 2012, we successfully extended our contract with Ford for three years beginning January 1, 2013.  We retained

---

[5]   On January 7, 2014, Jack Cooper issued an additional $150,000,000 aggregate principal amount of 9.25% Senior Secured Notes due 2020, in redemption of certain notes issued by Jack Cooper's wholly-owned finance subsidiary in connection with the acquisition of operating assets of Allied Systems Holdings, Inc.

[6]   *See* Jack Cooper's Offering Memorandum for 9.25% Senior Secured Notes due 2020, dated June 7, 2013 ("Offering Memorandum").

[7]   *See* Offering Memorandum, at p. 58 (emphasis added).

[8]   *Id.* at p. 62 (emphasis added).

routes that contribute to additional network efficiencies while halting operations on routes that were not profitable.  In addition, we achieved contracted rates that provide for improved margins.[9]

22.     Jack Cooper reaffirmed many of these same statements in its (i) December 31, 2015 Form 10-K ("December 2015 10-K"), which was signed by the Jack Cooper Individual Defendants on March 21, 2016, (ii) April 11, 2016 Registration Statement Amendment No. 2 ("April 2016 Registration Statement"), which was also signed by the Jack Cooper Individual Defendants, and (iii) May 12, 2016 Prospectus ("May 2016 Prospectus") provided to noteholders when the Notes were registered:

- ***Business Overview…*** Our largest customers include General Motors Company ("GM"), Ford Motor Company ("Ford") and Toyota Motor Sales, USA, Inc. ("Toyota"), for whom we have provided service for 87, 22 and 36 years, respectively. ***We have become a trusted provider for our OEM customers***, working closely with them on their logistics needs. In recent years, as a demonstration of our operational excellence and service, we were the first-ever auto carrier and one of just 68 and 82 companies, respectively, among GM's approximately 20,000 suppliers to receive the GM Supplier of the Year Award. Also, in May 2014, Ford management presented us with the Ford 2013 World Excellence Award. . . Our largest customer in the remarketed vehicle market is Ford, for whom we are the primary third-party logistical provider. We believe that our broad geographic footprint, breadth of services and operating expertise can be applied to ***further build our customers' operations both in North America and globally***.[10]

- ***Customers.***   Our customers are major domestic and foreign automotive OEMs, including GM, Ford, Toyota, Chrysler, Nissan, Mazda, and Hyundai/Kia. Our principal customers are auto manufacturers that use our services for delivery of new vehicles to dealers. For the years ended December 31, 2015, 2014, and 2013, our three largest customers, GM, Ford and Toyota, collectively accounted for 83%, 81%, and 86% of total revenue, respectively, and GM alone accounted for 40%, 38%, and 51%, respectively. ***We have developed and maintained long-term relationships with our***

---

[9]  *Id.* at p. 63.

[10]  December 2015 10-K, at p. 2 (emphasis added); April 2016 Registration Statement, at pp. 2 and 78 (emphasis added); May 2016 Prospectus, at pp. 2 and 78 (emphasis added).

NYC:389914.11

*significant customers and have historically been successful in negotiating contract renewals.* Under written contracts, we have served GM since 1928, Ford since 1984 and Toyota since 1979.[11]

- *Further Penetrate North American FVL Market...* Since 2009, we received increased business from or won new contracts with GM, Ford, Toyota, Nissan Motor Corporation, or Nissan, Hyundai/Kia Automotive Group, or Hyundai/Kia, and Chrysler Group LLC, or Chrysler.[12]

23.    During a June 17, 2016 investor call, just days before Plaintiff began purchasing the Notes, Jack Cooper adhered to its "script" of ironclad customer relationships.  Defendant Michael Riggs, Jack Cooper's controlling shareholder, CEO, president, treasurer, and board member, described his business as "too big to fail" given the volume of business provided to its three largest customers.  As proof of Jack Cooper's positive working relationships with two of its three largest customers, Mr. Riggs cited recent contractual price increases with both Ford and GM.  Additionally, Mr. Riggs touted Jack Cooper's position as far and away the largest of only two unionized auto hauling companies in North America as a distinct competitive advantage for retaining the business of Ford and GM.  Mr. Riggs also explained that UAW workers at the OEM manufacturing plants demand that car hauling services also be provided by unionized workers.

24.    In the same call, Mr. Riggs went so far as to give examples of how entrenched the union ties were between the auto haulers and the OEM manufacturing plants in order to illustrate

---

[11]  December 2015 10-K, at p. 8 (emphasis added); April 2016 Registration Statement, at p. 84 (emphasis added); May 2016 Prospectus, at p. 84 (emphasis added).

[12]  May 2016 Prospectus, at p. 5; April 2016 Registration Statement, at p. 5; *see also* December 2015 10-K, at p. 5.

the pressure felt by Ford and GM to remain loyal to Jack Cooper.  Neither Mr. Riggs nor Jack

Cooper, however, even so much as hinted that its largest customers were threatening to

discontinue business or had the contractual right to terminate their business due to the Covenant

or Jack Cooper's significant debt.

25.     The Offering Memorandum, the April 2016 Registration Statement, the May 2016

Prospectus, and Jack Cooper's various public filings contained only the most generic or "vanilla"

risk factors.  Jack Cooper never even mentioned the existence of the Covenant, much less the

inherent risks associated with it (*e.g.*, major loss of revenue due to contract termination).  The

Offering Memorandum, the April 2016 Registration Statement, the May 2016 Prospectus, and

Jack Cooper's public filings merely contained the "vanilla" risk factor that "[t]he loss of any of

[Jack Cooper's] major customers would adversely affect [its] business."[13]  Despite Jack Cooper's

knowledge, there was no mention or disclosure that any customer loss was anticipated or

imminent.

26.     Although Jack Cooper's Offering Memorandum, April 2016 Registration

Statement, and May 2016 Prospectus  advised that Jack Cooper's substantial "indebtedness could

adversely affect [its] financial health and prevent [it] from fulfilling [its] obligations,"[14] those

---

[13]  December 2015 10-K, at p. 8; April 2016 S-4, at p. 21; May 2016 Prospectus, at p. 21; April 2016 Registration Statement, at
pp. iii and 21.

[14]  *See* Offering Memorandum, at p. 26; April 2016 Registration Statement, at pp. iii and 31; May 2016 Prospectus, at pp. iii and
31.

NYC:389914.11

cautionary statements  mentioned only covenants contained in its various debt documents - - as opposed to covenants in any key customer agreement.[15]   At all relevant times, Jack Cooper deliberately failed to disclose the material risks of key customer flight as a consequence of Jack Cooper's breach, or imminent breach, of the Covenant.

27.     After performing an in-depth analysis, which included a detailed review of Jack Cooper's historical financials and disclosures through information and data contained in Jack Cooper's investor portal and SEC filings, multiple calls with industry consultants and Wall Street analysts, and a conference call with Michael Riggs, Plaintiff decided to begin purchasing Notes. From June 21, 2016 to July 21, 2016, Plaintiff purchased Notes in the aggregate principal amount of $28 million, at prices ranging from 61 to 71.75 cents on the dollar.[16]

28.     When purchasing the Notes, Plaintiff relied on Jack Cooper's repeated representations and statements about the strength and longevity of its customer relationships. Jack Cooper led Plaintiff to believe that its customer contracts (and associated revenue streams) were stable and would remain in effect.  In fact, however, Jack Cooper's customer relationships were crumbling.  Indeed, Jack Cooper's contract with one of its largest customers contained the

---

[15] *See* Offering Memorandum, at p. 26; April 2016 Registration Statement, at p. 31; May 2016 Prospectus, at p. 31.

[16] Plaintiff purchased the Notes in the following transactions: (i) $14 million Notes for  61 cents on the dollar on June 21, 2016, (ii) $6,000,000 Notes for 64.5 cents on the dollar on June 30, 2016, (iii) $1,000,000 Notes for 67 cents on the dollar on July 11, 2016, and (iv) $7,000,000 Notes for 71.75 cents on the dollar on July 21, 2016 (note that this last purchase was partially offset by a sale of $2,000,000 Notes for 72.75 cents on the dollar).

NYC:389914.11

material - - and still then undisclosed - - Covenant that enabled the customer to terminate its business relationship with Jack Cooper.

29.     On November 2, 2016, in a Form 8-K filing with the SEC ("November 2, 2016 8-K"), Jack Cooper finally disclosed that it lost business from one of its three largest customers (which Jack Cooper failed to identify by name).  This loss was significant, resulting in an estimated $14 million to $16 million revenue decline.[17]

30.     Jack Cooper's November 2, 2016 8-K also disclosed that "another one of our largest customers has indicated its concern with our financial position and is evaluating its relationship with us."[18]  Jack Cooper belatedly disclosed that this unidentified customer (which could have accounted for as much as 45% of Jack Cooper's annual revenue)[19] had the right under the Covenant to terminate its business with Jack Cooper if the company failed to keep its leverage ratio at or below 3.3x Debt to EBITDA as of December 31, 2016.[20]  Meanwhile, Jack Cooper's Debt to EBITDA ratio for the twelve month period ending on June 30, 2016, was 10.66x (over three times the allowable level).[21]  Prior to November 2, 2016, and at all times

---

[17]  *See* November 2, 2016 8-K, at p. 4 ("[R]ecently [Jack Cooper] lost business related to certain traffic lanes from one of our largest three customers, in part related to customer's concerns about our leverage. The Company estimates that the lost business will result, starting in 2017, in annual revenue declines of between $14 million and $16 million and reduced earnings of between $3.5 million and $4.5 million.")

[18]  *Id.*

[19]  *See* November 2, 2016 8-K, at p. 6.

[20]  *Id.* at p. 7.

[21]  *Id.*

relevant to Plaintiff's purchase of the Notes, Jack Cooper failed to disclose both the existence of

any such Covenant and that it was in breach (or imminent breach) thereof.

31.     As summarized above, the November 2, 2016 8-K belatedly broke the news in the

following manner, making clear that Jack Cooper's supposed customer loyalty and trust that it

had touted for years was long gone:

> *Our largest customers* have expressed concern about our financial
> condition and our significant leverage and *have indicated that they are
> closely monitoring our financial situation* as they consider our position
> as a significant supplier to them. *We believe that our recent loss of
> business related to certain traffic lanes from one of our three largest
> customers during the bidding process this year was in part related to
> their concerns about our significant leverage*. *Further, under our
> current contract with another one of our three largest customers, which
> expires in December 2018, the customer has the right to terminate or
> renegotiate the terms of the agreement if we have failed to achieve a
> Debt to EBITDA ratio, as defined in the agreement, of 3.3x as of
> December 31, 2016. Our Debt to EBITDA ratio as defined by the
> agreement for the last twelve months ended June 30, 2016 was 10.66x.*
> That same customer has further indicated to our management that unless
> we begin to address our leverage as required by the contract and provide
> them with assurances regarding our continued financial stability by the
> end of 2016, *they will seek to diversify their suppliers of transport
> services, will enforce this contract provision and will move a large
> portion of their transport business currently managed by us to other
> suppliers*. We are engaged in ongoing discussions with that customer and
> other customers about our financial position, and *also believe that
> concerns about our financial condition are impeding some of our
> customers from entering into extended terms of service agreements with
> us*. This Exchange Offer is intended to address the concerns that customer
> and our other customers have expressed to us; however, this Exchange
> Offer will not bring us into compliance with the aforementioned contract
> provision. Although we intend to continue to explore a transaction
> following this Exchange Offer to bring us in compliance with the
> customer contract provision, there can be no assurance that we will be
> successful in achieving such goal. Accordingly, there can be no assurance
> that completion of this Exchange Offer, or any future transaction, will

otherwise satisfy our customers' concerns and that they will not move a significant portion of our business to other suppliers.[22]

32.     The November 2, 2016 8-K had a marked impact on the price of the Notes, causing their value to plummet more than 20 points in just days of trading.  Specifically, the Notes traded at 47 cents on the dollar on November 2, 2016, as compared to 67.5 cents on the dollar on October 25, 2016.[23]   The pain continued in the days and weeks that followed, as the Notes traded as low as approximately 34.75 cents on the dollar, wiping out nearly half of the bond value.

33.     On November 17, 2016, Jack Cooper's senior management and general counsel met with investors to discuss (i) the announced exchange offer for its holding company debt, and (ii) actual and imminent customer losses attributed to the Covenant and Jack Cooper's significant leverage.  During this meeting, Jack Cooper's CEO, Michael Riggs, reaffirmed the previously undisclosed fact that one of Jack Cooper's largest customers was seriously considering terminating its contract due to the imminent breach of the Covenant.  Mr. Riggs went on to state that if this customer (which Mr. Riggs did not name) carried out its threats and terminated the

---

[22] *Id.* (emphasis added).   Concurrent with its release of the November 2016 8-K, Jack Cooper announced that its parent company, Jack Cooper Enterprises, Inc., was commencing an unregistered offer to exchange up to $80.45 million of its $186.7 million 10.50%/11.25% Senior PIK Toggle Notes due 2019 for (i) cash and (ii) warrants to purchase shares of Jack Cooper Enterprises, Inc.'s Class B Common Stock (the "Exchange Offer").  The Exchange Offer was announced as part of an overall plan to refinance outstanding debt of Jack Cooper and its related entities.

[23] Hema Oza & Paunie Samreth, *Jack Cooper Bonds Plummet As Customer Jumps Ship, Hedge Fund Swoops In*, FORBES (Nov. 2, 2016, 5:21 PM), https://www.forbes.com/sites/debtwire/2016/11/02/jack-cooper-bonds-plummet-as-customer-jumps-ship-hedge-fund-swoops-in/#9de2beb2d3a1.

14

contract, Jack Cooper would likely be forced to file for bankruptcy and liquidate, leaving noteholders with little to no recovery.

34.     That Jack Cooper failed to timely disclose this risk is incomprehensible.  Indeed, the November 2, 2016 8-K demonstrates that in June 2016 (before Plaintiff started purchasing the Notes), Jack Cooper was well aware that it was on the verge of breaching the Covenant - - which required a 3.3x Debt to EBITDA ratio - - with one of its most important customers, and Jack Cooper was further aware that the loss of this large customer's business would likely thrust it into bankruptcy and ultimately a liquidation.  Upon information and belief, Jack Cooper's own financial projections throughout 2016 should have indicated that such a breach was inevitable.  Yet, Jack Cooper said nothing of these facts prior to the November 2, 2016 8-K.

35.     Having lost all faith in Jack Cooper, Plaintiff began selling its Notes on or about November 17, 2016, resulting in a loss of over $5 million on purchases made less than six months earlier.[24]

## V.
## COUNT 1: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST JACK COOPER

36.     Plaintiff incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

---

[24] Plaintiff sold the Notes in the following transactions: (i) $10 million Notes for 42 cents on the dollar on November 17, 2016, (ii) $5,000,000 Notes for 39.625 cents on the dollar on November 22, 2016, (iii) $2,000,000 Notes for 39.625 cents on the dollar on November 23, 2016, and (iv) $9 million Notes for 35.5 cents on the dollar on November 29, 2016.

NYC:389914.11

37.     The Notes are securities within the meaning and intent of the Exchange Act and the rules and regulations adopted pursuant thereto.

38.     In committing or causing the acts and transactions herein alleged, Jack Cooper, in connection with the purchase and sale of securities, employed a device, scheme or artifice to defraud; omitted to state material facts necessary to make its public statements, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated as fraud or deceit.

39.     Jack Cooper's misleading omission of numerous, material facts (*see, e.g.,* ¶¶ 22 - 26, 28 - 31, 33, and 34, *supra*) were made knowingly, intentionally, or recklessly for the purpose of inducing (and thereby actually inducing) Plaintiff to purchase the Notes at inflated prices.[25] Had Jack Cooper made adequate disclosure of the known, imminent customer flight risks instead of hiding the truth, Plaintiff would not have purchased the Notes.

40.     Further, Jack Cooper led investors to believe that the primary risk presented by its existing debt was a potential default under its credit facility or the failure to meet its financial obligations.   In fact, however, Jack Cooper's more significant risks (which were not timely

---

[25] Jack Cooper's omissions were material, as there was a substantial likelihood that disclosure of the omitted facts would have been viewed by reasonable investors as having significantly altered the total mix of information made available.

disclosed) were (i) the existence of the Covenant, (ii) the risk of significant loss of business due to the Covenant, and (iii) deteriorating relationships with its other largest customers.

41.    The statements made in Jack Cooper's Offering Memorandum, April 2016 Registration Statement, May 2016 Prospectus, public disclosures, and investor calls were materially false and misleading because Jack Cooper failed to disclose the significant, impending risks associated with its customer flight, the existence of the Covenant and the forthcoming violations of such contractual Covenant.  At the time these omissions were made, Jack Cooper (and the Jack Cooper Individuals Defendants) knew facts and/or had access to undisclosed information which made its public statements inaccurate and materially misleading. Specifically, Jack Cooper knew that its key customer contract(s) contained the Covenant and that its existing Debt to EBITDA Ratio far exceeded the 3.3x ratio allowable under the Covenant. There can be no doubt that these undisclosed facts made Jack Cooper's public statements about the stability and longevity of its customer relationships inaccurate and misleading.

42.    Jack Cooper's omission of material facts was made at least recklessly, if not with the intent to deceive or defraud investors.  Jack Cooper had both the motive and opportunity to commit fraud.  Specifically, the magnitude of Jack Cooper's debt and the serious consequences resulting from Jack Cooper's customer flight and imminent violation of the Covenant provided Jack Cooper with a substantial motive to misrepresent its financial condition and the existence of

the Covenant, which was material to the likelihood of Jack Cooper maintaining long-term customer relationships.  Jack Cooper either had actual knowledge of the misleading nature of its public statements and the inaccuracies caused by its failure to account for these negative conditions and disclose same to investors, or it acted in reckless disregard of information known to it at the time about the imminent loss of its customers.  At all relevant times, Jack Cooper had a duty and obligation to correct its false and misleading disclosures.  Specifically, Jack Cooper had an obligation to disclose its imminent violation of the Covenant and losses of customer contracts to make Jack Cooper's financial disclosures complete and accurate.

43.     Plaintiff did not know, and had no ability to know, the information omitted from disclosure by Jack Cooper.  For example, none of Jack Cooper's public statements attached its existing contract(s) containing the Covenant or even described the applicable terms thereof. Plaintiff did not know the statements made in connection with the Notes were untrue and incomplete, and Plaintiff reasonably relied on the accuracy and completeness of the information provided by Jack Cooper in connection with Plaintiff's purchase of the Notes.

44.     By failing to disclose to investors the adverse facts detailed and described herein, Jack Cooper presented a misleading picture of its contractual relationships with its customers- - its three largest ones in particular.  Jack Cooper's omissions caused the Notes to trade at artificially inflated prices at the time Plaintiff purchased the Notes.  The timing and magnitude of

the decline in price of the Notes negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Jack Cooper's reckless or fraudulent conduct.

45.     Plaintiff, in reliance on the presumed integrity of Jack Cooper's disclosures and the artificially optimistic picture Jack Cooper painted about its long-term customer contracts and associated revenues, purchased the Notes at prices it otherwise would not have paid.  Indeed, Plaintiff would not have purchased the Notes at all if it had been aware of Jack Cooper's omissions of material information.  Plaintiff suffered economic losses as a direct and proximate result of Jack Cooper's fraudulent and/or reckless acts, conduct and omissions.  Specifically, Plaintiff incurred damages because Jack Cooper failed to make truthful, accurate and complete disclosures of information about its contractual relationships (as necessary to prevent its statements from being materially false and misleading).

46.     In addition to the reliance described above, Plaintiff invokes the presumption of reliance established by the fraud-on-the-market doctrine.  In this regard, Jack Cooper omitted material facts from information that was publicly disclosed during all relevant times, and Plaintiff purchased the Notes between the time Jack Cooper failed to disclose material facts and the time those facts were revealed, without knowledge of the omitted facts. Further, at all

relevant times, the market for the Notes was an efficient market for the following, among other

reasons:

- Jack Cooper communicated with public investors via established market communication mechanisms, including through disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- At least four securities analysts, including Wells Fargo, GMP Securities, Imperial Capital and RW Pressprich, followed and reported on the Notes. These reports were publicly available and entered the public marketplace;

- The drop in market price of the Notes occurred immediately after Jack Cooper's disclosure of actual and impending customer losses; and

- Market makers - - *i.e.*, parties who (i) regularly published bid and offer quotations, (ii) furnished such quotations upon request, and/or (iii) were ready, willing and able to transact in reasonable quantities at quoted prices - - dealt in the Notes.

47.     Jack Cooper cannot avail itself of any safe harbor protections by citing to general

cautionary language and boilerplate risk factors contained in the Offering Memorandum, May

2016 Prospectus, or its public filings.  Jack Cooper's generalized cautions about generic risk

factors were not meaningfully cautionary in that they were not company-specific warnings based

on realistic descriptions of the risks applicable to the particular circumstances.  Rather, Jack

Cooper's "warnings" were merely a boilerplate recitation of generally applicable risk factors.

Further, Jack Cooper's misstatements and/or omissions were not forward looking statements

protected by the "bespeaks caution doctrine," as their truth or falsity could be determined at the

time they were made.  Given the then-existing facts contradicting Jack Cooper's statements, any

generalized risk disclosures made by Jack Cooper were insufficient to insulate Jack Cooper from

liability for its material omissions.

48.    By virtue of the above, Jack Cooper has violated Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder, and Jack Cooper is therefore liable to Plaintiff for

damages incurred as a result of such violation.

**VI.**
**COUNT 2:  VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**AGAINST THE JACK COOPER INDIVIDUAL DEFENDANTS**

49.    Plaintiff incorporates by reference and re-alleges each and every allegation in the

preceding paragraphs as if fully set forth herein.

50.    As stated above, Plaintiff has alleged a primary violation of Rule 10b-5 by a

"controlled person," namely, Jack Cooper.  Jack Cooper is liable to Plaintiff based on its

materially misleading omissions set forth above.

51.    The Jack Cooper Individual Defendants acted as controlling persons of Jack

Cooper within the meaning of section 20(a) of the Exchange Act.  These defendants had the

power to influence and control and did influence and control, directly or indirectly, the

dissemination of information that contained materially misleading omissions.  Each of these

defendants had direct and supervisory involvement in the day-to-day operations of Jack Cooper

21

and had the power to control or influence the decision to omit material information that should have been disclosed to Jack Cooper's investors.

52.     Specifically, Michael Riggs served at all relevant times as Jack Cooper's CEO, president, treasurer, and as a member of Jack Cooper's board of directors.  Mr. Riggs was also the controlling owner of Jack Cooper, owning and/or controlling approximately 70% of Jack Cooper's outstanding voting securities.[26]  According to Jack Cooper, Mr. Riggs has "extensive experience and in-depth knowledge of [Jack Cooper]," and, alongside his daughter (who chairs Jack Cooper's board of directors), "commands" Jack Cooper's "business plans and strategic initiates."[27]  In addition, Mr. Riggs signed multiple SEC filings, including the December 2015 10-K and April 2016 Registration Statement, and omitted material information when making statements to Plaintiffs on behalf of Jack Cooper.

53.     Michael Testman served at all relevant times as Jack Cooper's CFO and as a member of Jack Cooper's board of directors.  In addition, Mr. Testman signed multiple SEC filings, including the December 2015 10-K and April 2016 Registration Statement, and signed numerous other SEC filings that could have - - but did not - - disclose the debt Covenant and actual or imminent loss of key customers.  Six weeks after Mr. Testman resigned from Jack

---

[26] April 11, 2016 Registration Statement, at p. 90.

[27] *Id.*

Cooper, his successor signed the November 2, 2016 8-K that belatedly disclosed the Covenant and loss of business.

54.     Based on their executive-level positions and daily activities within Jack Cooper (and their representation to the market that they were the leaders of Jack Cooper, including due to Michael Riggs' controlling ownership, their regular practice of signing disclosures and otherwise communicating with the market on Jack Cooper's behalf) the Jack Cooper Individual Defendants had the ability, opportunity, and duty to prevent Jack Cooper from making the material omissions discussed above.  Instead, despite the grave risk of losing one or more critical customers and being forced into bankruptcy and their obligation to be aware of and disclose those risks, the Jack Cooper Individual Defendants controlled Jack Cooper's message by fervently sticking to the script of ironclad customer relationships described in detail above. These defendants were culpable participants that acted at least recklessly, if not with fraudulent intent, through participating in and controlling Jack Cooper's misleading omissions and in failing to timely disclose material information - - such as the imminent and inevitable breach of the Covenant and the loss of key customers - - that they were certainly capable of disclosing and should have disclosed.

NYC:389914.11

55.     By virtue of the foregoing, each of the Jack Cooper Individual Defendants are responsible for the damages incurred by Plaintiff and jointly and severally liable for violating section 20(a) of the Exchange Act.

## VII.
## DISCOVERY RULE

56.     Plaintiff incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

57.     Plaintiff's claims were brought within two years of Plaintiff's discovery of Jack Cooper's fraudulent omissions and within five years of Jack Cooper's making of the statements alleged to be false and misleading and/or omitting to state material facts related thereto.

58.     Further, Plaintiff did not, and could not in the exercise of due diligence, discover Jack Cooper's wrongdoings, as described above, until at least November 2, 2016.  Accordingly, the periods of limitation under the Exchange Act did not commence until November 2, 2016, at the earliest.

## VIII.
## JURY DEMAND

59.     Plaintiff hereby demands a trial by jury.

24

## IX.
## PRAYER FOR RELIEF

60.     WHEREFORE, Plaintiff demands judgment against Jack Cooper and the Jack

Cooper Individual Defendants, jointly and severally, as follows:

(i)     Awarding Plaintiff damages, both general and special, as allowed by law

and by equity, plus interest at the rate allowable by law;

(ii)    Awarding Plaintiff's reasonable costs and expenses, as allowed by law and

by equity (including reasonable and necessary attorneys' fees, to the

extent such fees are allowable by law); and

(iii)   Awarding and granting such other and further relief as the Court may

deem just and proper.

NYC:389914.11

**ANDREWS KURTH KENYON LLP**

By:/s/ Paul N. Silverstein
Paul N. Silverstein (PS5098)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 850-2819
Facsimile: (212) 850-2929
paulsilverstein@andrewskurth.com

Joseph W. Buoni (*Pro Hac Vice Pending*)
600 Travis Street, Suite 4200
Telephone: (713) 220-3928
Facsimile: (713) 220-4285
josephbuoni@andrewskurth.com

**COUNSEL TO PLAINTIFF, RIVER
BIRCH CAPITAL, LLC**

NYC:389914.11