UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                            :
RIVER BIRCH CAPITAL, LLC,                   :
                                            :        17cv9193
                   Plaintiff,               :
                                            :        OPINION & ORDER
       -against-                            :
                                            :
JACK COOPER HOLDINGS CORP., *et al.*,       :
                                            :
                   Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior United States District Judge:

   Defendants Jack Cooper Holdings Corporation ("Jack Cooper"), T. Michael

Riggs, and Michael Testman (the "Individual Defendants," and collectively with "Jack Cooper,"

the "Defendants") move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended

Complaint ("Complaint") in this securities fraud action brought by River Birch Capital, LLC

("River Birch"). For the reasons that follow, Defendants' motion is granted.

BACKGROUND

   The allegations in the Complaint are presumed true on this motion. Jack Cooper

is the largest transporter of light vehicles in North America and provides logistics for major

automotive original equipment manufacturers ("OEMs"). (Amended Complaint, ECF No. 40

("Compl."), ¶¶ 2, 21.) Its three largest customers are General Motors, Ford, and Toyota.

(Compl. ¶ 21.) Defendant Riggs is the chief executive officer, president, and treasurer of Jack

Cooper, as well as a member of the Board of Directors and the company's controlling

shareholder. (Compl. ¶ 13.) Defendant Testman is a member of the company's Board of

Directors and its former chief financial officer. (Compl. ¶ 14.)

   This action arises from River Birch's purchase of $28 million in senior secured

notes (the "Notes") issued by Jack Cooper.  (Compl. ¶ 30.)

I.    Issuance of the Notes and Jack Cooper's Public Disclosures

Jack Cooper issued the Notes on June 18, 2013 in an aggregate principal amount

of $225 million.  (Compl. ¶ 22.)  At that time, Jack Cooper made several statements in its

Offering Memorandum (the "June 2013 Offering Memorandum") concerning its customer

relationships.  (Compl. ¶ 23.)  Specifically, the June 2013 Offering Memorandum stated:

- "Customer switching is infrequent given the significant infrastructure and network capacity needed to meet the demanding transportation requirements of our customers. As a result, we have long-term relationships with most of our customers, including . . . GM, Ford, and Toyota."  (Compl. ¶ 23.)

- "We have multi-year contractual relationships with OEM customers that comprise 89% of the total U.S. automobile OEM market.  Due to the critical nature of the services we provide, customer switching is infrequent . . . We believe the long-term contractual relationships with our customers provide us with revenue visibility." (Compl. ¶ 23.)

- "We believe that we will be able to continue to enter into new contracts and modify existing contracts to enhance our long-term profitability."  (Compl. ¶ 23.)

- "During 2012, we successfully extended our contract with Ford for three years beginning January 1, 2013."  (Compl. ¶ 23.)

Jack Cooper reiterated the strength of the company's customer relationships in its December 21,

2015 Form 10-K, its April 11, 2016 Registration Statement Amendment, and a May 12, 2016

Prospectus provided to noteholders when the Notes were registered (collectively, the "2015 and

2016 Public Disclosures"), all of which were signed by Riggs and Testman.  (Compl. ¶ 24.)

Specifically, these materials declared:

- "We have become a trusted provider for our OEM customers . . . We believe that our broad geographic footprint, breadth of services, and operating expertise can be applied to further build our customers' operations both in North America and globally."  (Compl. ¶ 24.)

- "We have developed and maintained long-term relationships with our significant customers and have historically been successful in negotiating contract renewals." (Compl. ¶ 24.)

## II. The June 2016 Investor Call and River Birch's Purchases

In 2016, River Birch contemplated purchasing the Notes and undertook "a detailed review of Jack Cooper's historical financials and disclosures through information and data contained in [its] investor portal and SEC filings, multiple calls with industry consultants and Wall Street analysts, and a conference call with [Riggs]." (Compl. ¶ 30.) During that investor call on June 17, 2016 (the "Investor Call"), Riggs characterized Jack Cooper as "too big to fail," citing recent contractual price increases and the importance of its unionized work force. (Compl. ¶ 26.)

After concluding its due diligence, River Birch purchased Notes in the aggregate principal amount of $28 million, at prices ranging from 61 to 71.75 cents on the dollar, in four separate transactions between June 21, 2016 and July 21, 2016. (Compl. ¶ 30 & n.19.)

## III. The November 2016 8-K and Resultant Note Sales

On November 2, 2016, Jack Cooper filed a Form 8-K (the "November 2016 8-K") with the SEC in which it disclosed that its largest customers had "expressed concern about [the company's] financial condition and [its] significant leverage" and that it had "recent[ly] [lost] business related to certain traffic lanes from one of [its] three largest customers" in part because of these concerns. (Compl. ¶ 35.) In addition, Jack Cooper disclosed that its relationship with another one of its largest customers was in jeopardy because of an "easy out" covenant in its contract with that customer (the "Covenant"). (Compl. ¶ 34.) Specifically:

[T]he customer has the right to terminate or renegotiate the terms of the agreement [expiring in 2018] if we have failed to achieve a Debt to EBITDA ratio, as defined in the agreement, of 3.3x as of December 31, 2016. Our Debt to EBITDA ratio as defined by the agreement [as of] June 30, 2016 was 10.66x.

> That same customer has further indicated . . . that unless we begin to address our leverage as required by the contract and provide them with assurances regarding our continued financial stability by the end of 2016, they will . . . enforce this contract provision and will move a large portion of their transport business currently managed by us to other suppliers. We . . . also believe that concerns about our financial condition are impeding some of our customers from entering into extended terms of service agreements with us.

(Compl. ¶ 35.)

The November 2016 8-K disclosure occurred in tandem with the announcement of an unregistered exchange offer (the "Parent Company Exchange Offer") by Jack Cooper's parent company, Jack Cooper Enterprises, Inc. ("Jack Cooper Enterprises"). Under the Parent Company Exchange Offer, Jack Cooper Enterprises would exchange its notes for 13 cents on the dollar and warrants to purchase Jack Cooper Enterprises common stock. (Compl. ¶ 36.) In the November 2016 8-K, Jack Cooper expressed its hope that the "[Parent Company] Exchange Offer [would] address the concerns that [the 'easy out' customer] and our other customers have expressed to us," but conceded that the Parent Company Exchange Offer "will not bring us into compliance with the aforementioned contract provision." (Compl. ¶ 35.) Finally, the November 2016 8-K cautioned that "there can be no assurance that completion of this [Parent Company] Exchange Offer, or any future transaction, will otherwise satisfy our customers' concerns and that they will not move a significant portion of our business to other suppliers." (Compl. ¶ 35.)

Following these announcements, the value of the Notes dropped from 67.5 cents on the dollar to 47 cents on the dollar and tumbled as low as 34.75 cents on the dollar in the ensuing weeks. (Compl. ¶ 37.) At a November 17, 2016 investor meeting, Riggs reiterated the precarious state of the company's customer relationships and told investors that if the unnamed customer terminated the "easy out" contract, Jack Cooper "would likely be forced to file for bankruptcy or liquidate." (Compl. ¶ 38.) Starting that day, River Birch then sold its Notes in

four transactions that netted a loss of over $5 million. (Compl. ¶ 40 & n.31.) Finally, River

Birch alleges that Jack Cooper took advantage of this drastic drop in the value of the Notes by

later announcing its own exchange offer (the "Jack Cooper Exchange Offer") seeking to

reacquire the Notes at 35 cents on the dollar. (Compl. ¶ 37.)

       River Birch asserts Section 10(b) and Rule 10b-5 claims against all Defendants,

as well as Section 20(a) claims against the Individual Defendants. River Birch alleges that

Defendants defrauded River Birch by creating an artificially optimistic picture of Jack Cooper's

future and failing to timely disclose the weaknesses in its customer relationships.

DISCUSSION

I.    <u>Standard</u>

   A.  <u>Rule 12(b)(6) Motion</u>

       To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a

complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell

Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "A claim is facially plausible 'when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)

(citation omitted). The plausibility standard is "not akin to a 'probability requirement,' . . . [but]

it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S.

at 678. In deciding a Rule 12(b)(6) motion, the court construes all reasonable inferences in the

plaintiff's favor. <u>Gonzalez v. Hasty</u>, 802 F.3d 212, 219 (2d Cir. 2015). The court may also

"consider any written instrument attached to the complaint, statements or documents

incorporated into the complaint by reference, legally required public disclosure documents filed

5

with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013).

B. PSLRA and Rule 9(b)

"A securities fraud complaint must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ['PSLRA'] and Rule 9(b) by stating with particularity the circumstances constituting fraud." Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 482 (S.D.N.Y. 2018) (citing ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)). A plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This pleading constraint [provides] a defendant with fair notice of a plaintiff's claim [and] safeguard[s] [its] reputation from improvident charges of wrongdoing." ATSI Commc'ns, Inc v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

Thus, to satisfy this standard, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI, 493 F.3d at 99. Moreover, under the PSLRA, "the complaint . . . [must] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [the complaint must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must "do more than say that the statements . . . were false and misleading; [it] must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

II.    Section 10(b) and Rule 10b-5 Claims

Section 10(b) makes it unlawful for "any person, directly, or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in contravention of rules and regulations promulgated by the SEC for the protection of investors.  In turn, Rule 10b-5 makes it unlawful to, in connection with the purchase or sale of any security, "employ any device, scheme, or artifice to defraud"; to "make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading"; or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. 240.10b-5.

To prevail on a securities fraud claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omissions and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).  Defendants contest the first two prongs.

A.    Misstatements or Omissions of Material Fact

Plaintiffs have alleged both misstatements and omissions.  Accordingly, this Court addresses each in turn.  See In re Express Scripts Holding Co. Sec. Litig., 2017 WL 3278930, at *11–13 (S.D.N.Y. Aug. 1, 2017) (analyzing misstatement and omissions theories separately).

i.    Misstatements

"[H]alf-truths—representations that state the truth only so far as it goes, while

omitting crucial qualifying information—can be actionable misrepresentations [under Section 10(b) and Rule 10b-5]." Univ. Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1994 (2016). Even if "literally true," affirmative statements may be rendered false by what they fail to disclose. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 240 (2d Cir. 2016) (citation omitted). Here, River Birch alleges that Defendants' statements about Jack Cooper's strength and customer relationships in the June 2013 Offering Memorandum, 2015 and 2016 Public Disclosures, and on the Investor Call were misleading because they did not mention: "(1) Jack Cooper's actual and impending customer flight; (2) the existence of the Covenant; and (3) the actual or imminent breach and enforcement of the Covenant." (Compl. ¶ 46.) Defendants argue that all of their affirmative statements were literally true, and in any event, are not actionable under Section 10(b) and Rule 10b-5. This Court groups the allegedly misleading statements into several categories—(1) historical statements of fact, (2) puffery, (3) present statements of fact, and (4) opinion statements.

First, River Birch's historical statements of fact regarding its Ford contract, past success in contract renewal negotiations, and status as a "trusted provider" for OEMs, (Compl. ¶¶ 23, 24), are nonactionable as a matter of law. Judges in this district have consistently rejected Section 10(b) and Rule 10b-5 liability for literally true historical statements that "create an implicit promise" as to future company success. In re Coty Inc. Sec. Litig., 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2006); see also Rombach, 355 F.3d at 174 ("Accurate statements about past performance are self evidently not actionable under the securities laws."). And "[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." In re Initial Pub. Offering Sec. Litig., 358 F.

Supp. 2d 189, 210 (S.D.N.Y. 2004) (quoting In re Sofamor Danek Grp., Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997)).

Second, Riggs's statement on the Investor Call that Jack Cooper was "too big to fail [given the company's relationships and union ties]," (Compl. ¶ 26), as well as Jack Cooper's optimism about its "broad geographic footprint, breadth of services, and operating expertise," (Compl. ¶ 24), are nonactionable puffery and expressions of corporate optimism. See ECA, 553 F.3d at 205–06 (statements about "highly disciplined [risk management processes] . . . designed to preserve the integrity of the risk management process" did not "amount to [any] guarantee[s]" and were too "broad [and] general" to induce reasonable reliance); Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (statements about defendants' "technology, knowledge, experience, and scientific resources [providing them] with competitive advantages" were "broad assertions" and non-actionable puffery).

Third, River Birch's present statements of fact about the infrequency of customer switching and its resultant long-term relationships do not give rise to a claim. (Compl. ¶ 23.) Importantly, River Birch does not allege that these statements were false. And Jack Cooper cannot be liable for failing to predict a customer downturn several years in the future. Such reasoning smacks of the "fraud by hindsight" theory disavowed in this circuit. City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG, 752 F.3d 173, 188 (2d Cir. 2014).

Finally, the remainder of the alleged misstatements are statements of opinion. "[S]tatements of opinion include subjective statements that reflect judgments as to values that [are] not objectively determinable." In re Aratana Therapeutics Inc. Sec. Litig., 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (quotation marks omitted) (alteration in original). In this case, Jack Cooper "believe[d]" that "the long-term contractual relationships with our customers provide us

with revenue visibility," and that "we will be able to continue to enter into new contracts and modify existing contracts that enhance our long-term profitability." (Compl. ¶ 23 (emphasis added).)

Opinion statements are analyzed under the <u>Omnicare</u> standard. Under this framework, the plaintiff must identify "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." <u>Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund</u>, 135 S. Ct. 1318, 1325 (2016). As it applies to this case, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." <u>Tongue v. Sanofi</u>, 816 F.3d 199, 209 (2d Cir. 2016).

However, in applying the <u>Omnicare</u> test, the Second Circuit cautioned that courts should refrain from "an overly expansive reading of this standard" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts, and . . . do[] not expect that every fact known to an issuer supports its opinion statement. . . . [Thus, a] statement of opinion is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." <u>Tongue</u>, 816 F.3d at 210 (quotation marks and citation omitted) (alterations in original).

The opinion statements in the June 2013 Offering Memorandum are not actionable because they predated the relevant customer problems by three years and the Complaint alleges no facts suggesting that these issues were or reasonably could have been anticipated at that point. <u>See</u> <u>Aratana</u>, 315 F. Supp. 3d at 755 (citation and quotation marks

omitted) (reasoning that opinion statements are not actionable purely on the basis that they were "not borne out by subsequent events"). And the Covenant, if it existed three years prior to the problems that it created (a fact which River Birch does not allege), had only speculative significance at that point and was at best one attenuated fact "cutting the other way" against Defendants' broadly optimistic forecast.

As a final note, River Birch contends that Jack Cooper "further represented in multiple annual and quarterly disclosures . . . that its business from Ford, GM, and Toyota . . . would continue to rise on account of increased business, increased rates, and/or new contracts." (Compl. ¶ 25.) The Complaint enumerates no specific statements to this effect, but includes a footnote with pincites to several public disclosures. Almost none of the cited pages contain any forward-looking statements. The lone forecasts of rising business—"we believe the strong rebound in light vehicle sales and production combined with a structural capacity shortage provides us with continued growth opportunities"—were stated in 2014 and 2015. (Decl. of Joseph Buoni in Opp. to Defs.' Mot. to Dismiss, ECF No. 50, Ex. 2 at 5, Ex. 5 at 5.) There are no facts suggesting that these statements were false or that, at least a year out from Jack Cooper's customer problems, Defendants failed to disclose any facts strongly cutting the other way. And in any event, a general statement accusing Jack Cooper of misrepresentations is insufficient to state a claim. See Nanopierce Tech., Inc. v. Southridge Cap. Mgmt. LLC, 2004 WL 2754653, at *10 (S.D.N.Y. Dec. 2, 2004) ("[T]he . . . PSLRA [was] designed to prevent plaintiffs from . . . making general formulaic allegations that a defendant made false or misleading statements about a certain matter." (citation and quotation marks omitted)).

Because none of the above statements are actionable on the face of the Complaint, and an "artificially optimistic" (Compl. ¶ 55) impression of the company's future does not by

itself meet the PSLRA's particularity requirements, this Court concludes that River Birch has not alleged any affirmatively misleading misstatements of fact or opinion.[1]

      ii.   Omissions

 In the alternative, this Court considers whether River Birch has adequately alleged that Defendants omitted material facts in the June 2013 Offering Memorandum, the 2015 and 2016 Public Disclosures, and the Investor Call.

"[A]n omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (citation and quotation marks omitted). "[I]n and of themselves, [Section] 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." Vivendi, 838 F.3d at 239. However, a duty may arise from "a company's decision to speak." Ong v. Chipotle Mexican Grill, Inc., 2017 WL 933108, at *9 (S.D.N.Y. Mar. 8, 2017). In other words, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) (citation omitted). But the Second Circuit has cautioned that this duty does not arise "merely because a reasonable investor would very much like to know" the information at issue. Vivendi, 838 F.3d at 223 (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)).

Critical to the court's inquiry is the question of when the duty to speak "ripen[s]." In re Hi-Crush Partners L.P. Sec. Litig., 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013). Put

---

[1]     To the extent that River Birch's opposition brief enumerates new allegedly misleading statements not pleaded in the Complaint, this Court declines to consider them. See, e.g., Pehlivanian v. China Gerui Advanced Materials Grp., Ltd., 2017 WL 1192888, at *2 n.2 (S.D.N.Y. Mar. 29, 2017) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss [and so] the Court will not consider any of Plaintiff's new allegations." (citation and quotation marks omitted)).

another way, in alleging that a defendant failed to disclose information, the plaintiff must plead facts suggesting that such information should have been revealed sooner. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."). To that end, it has been repeatedly held in this district that "defendants need not disclose matters that are merely speculative." Penn. Pub. Sch. Emp. Ret. Sys. v. Bank of Am. Corp. ("PPSERS"), 874 F. Supp. 2d 341, 352 (S.D.N.Y. 2012) (citing Acito v. IMCERA Grp., 47 F.3d 47, 53 (2d Cir. 1995)).

River Birch alleges three omitted facts that Defendants should have disclosed before the November 2016 8-K—(1) the existence of the Covenant; (2) the potentially large loss of business resulting from the imminent breach of the Covenant; and (3) "deteriorating relationships" with Jack Cooper's other customers who already had or were contemplating moving their business elsewhere. (Compl. ¶ 45.) River Birch is elliptical on when these omitted facts should have been disclosed, saying that "discovery will reveal" when this information should have been made public. (Compl. ¶ 45 n.33.) But as explained above, this is not an insignificant question, even at the pleading stage. Indeed, omissions cases turn on careful analyses of the plaintiff's allegations as to when omitted information should have been revealed. See, e.g., Express Scripts, 2017 WL 3278930, at *12–13 (scrutinizing the timeline of plaintiff's allegations to determine precisely when the duty to disclose attached); Wallace v. IntraLinks, 2013 WL 1907685, at *3–7 (S.D.N.Y. May 8, 2013) (same).

River Birch points out that for the twelve-month period ending on June 30, 2016, Jack Cooper's debt-to-EBITDA ratio was over three times higher than the rate required under the Covenant. (Compl. ¶ 45 n.33.) From that, River Birch infers that a breach of the Covenant was

13

inevitable and alleges in a footnote that it should have been disclosed before June 30, 2016. (Compl. ¶ 45 n.33.)  To compensate for the inherent vagueness of these allegations, River Birch relies on the principle that "[a] corporation has a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success."  Hi-Crush, 2013 WL 6233561, at *13.

However, River Birch's cited authorities do not relieve it of the obligation to allege non-speculative averments.  In Hi-Crush, a corporation extolled the value of an important customer relationship after that customer had already repudiated their contract.  Though the relationship had not been definitively terminated, "the dispute [already] appeared to be quite serious, litigation was an imminent possibility, and future sales . . . pursuant to the agreement were significantly uncertain."  Hi-Crush, 2013 WL 6233561, at *15.  Therefore, the court found that a duty to disclose had been triggered.  Hi-Crush, 2013 WL 6233561, at *15.  Similarly, in Hall v. The Children's Place Retail Stores, Inc., the plaintiffs identified 120 confirmed breaches of the contract between the defendant and its customer, which suggested that the relationship was "in danger of being terminated."  580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008).  And in another case, Wallace v. IntraLinks, the customer was alleged to have informed the defendant that it would not renew their contract, prompting the court to find an actionable claim for optimistic statements made after this exchange.  2013 WL 1907685, at *7 (S.D.N.Y. May 8, 2013).

But In re Express Scripts is closer to the mark and cuts the other way.  There, while the defendant corporation's customer had sent several notices that the defendant breached its contract, the duty to disclose did not attach until the customer made a "definitive statement" that it intended to terminate the business relationship.  Express Scripts, 2017 WL 3278930, at

14

*13.  Invoking the "ripened" language from <u>Hi-Crush</u>, the <u>Express Scripts</u> court reasoned that the defendant corporation's concerns had not risen above the "speculative" level until a notice of termination was provided.  <u>Express Scripts</u>, 2017 WL 3278930, at *13.

In contrast to these cases, River Birch alleges <u>no</u> notice of anticipated breach or termination and <u>no</u> communications between the customer and Defendants prior to the period incorporated in the November 2016 8-K.  In essence, River Birch asks this Court to extend the highly fact-specific holdings of <u>Hi-Crush</u>, <u>Hall</u>, and <u>Wallace</u> to a scenario resting on a Jenga tower of assumptions.  In River Birch's view, the fact that Jack Cooper was in breach of the Covenant six months before the relevant date allows the inferences that (1) Jack Cooper would be in breach by year's end and (2) despite any countervailing pressures to remain with Jack Cooper, the customer would invoke the Covenant and terminate the contract.

Ultimately, no allegations in the Complaint suggest that the breach and termination of the contract were anything other than a possibility prior to the November 2016 8-K.  That is a far cry from the "foregone conclusion" that would imply a prior duty to disclose. <u>Acito</u>, 47 F.3d at 53; <u>see</u> <u>In re Axis Cap. Holdings Ltd. Sec. Litig.</u>, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) (rejecting a duty to disclose where "Plaintiffs [had] essentially allege[d] that Defendants had a duty to disclose the existence of improper business practices prior to any indication that those practices were under scrutiny"); <u>cf.</u> <u>PPSERS</u>, 874 F. Supp. 3d at 348, 351–52 (finding duty to disclose risks associated with mortgage electronic registration system ("MERS") after "courts had in fact [already] found problems with MERS").

The remaining omission—Jack Cooper's "deteriorating relationships" with its customers—is similarly unavailing.  River Birch pleads no facts suggesting that Jack Cooper had any notice prior to the November 2016 8-K that its customers were concerned about the

company's finances or that this anxiety had prompted them to reconsider their relationship. River Birch alleges that the November 2016 8-K discloses that Defendants knew about these problems "throughout 2016." (Compl. ¶ 33.) But that is not what the November 2016 8-K says—it merely states that discussions were "ongoing." (Compl. ¶ 35.) See Rivera v. Carroll, 2009 WL 2365240, at *8 n.5 (S.D.N.Y. Aug. 3, 2009) ("[T]he Court need not accept as true Plaintiff's characterization of [an incorporated document's] content because that content contradicts such characterization."). With no other allegations, River Birch argues that it is "highly unlikely that all of these customers started complaining at the exact same time shortly before the [November 2016 8-K] disclosure." (Compl. ¶ 45 n.33.) But this conclusory assumption in a footnote is insufficient to establish the existence of a duty to disclose prior to November 2016.

And in any event, even if Jack Cooper's prior risk factor disclosures never explicitly connected leverage concerns to customer flight, Jack Cooper amply and repeatedly disclosed that "[o]ur business is highly dependent on our largest customers . . . a reduction in business from these customers resulting from a failure to renew contracts . . . and other factors could materially impact our net sales [and] the loss of any major customer could have a material adverse effect on our financial condition." (Decl. of Paul Straus in Supp. of Defs.' Mot. to Dismiss ("Straus Decl."), ECF No. 43, Ex. 3, at 21.) Moreover, Jack Cooper warned that its "substantial indebtedness could . . . make[] it more difficult . . . to satisfy [its] financial obligations." (Straus Decl. Ex. 3, at 32.) It bears underscoring that "[c]orporate officials need not be clairvoyant" and a securities fraud claim is not actionable when it hinges solely upon the argument, absent any other supporting allegations, that a defendant failed to predict a future

development.  <u>Novak</u>, 216 F.3d at 309; <u>In re Sanofi Sec. Litig.</u>, 87 F. Supp. 3d 510, 543

(S.D.N.Y. 2015).

        This Court is unwilling to expand the duty to disclose to a more speculative plane,

lest the "speak[ing] on a topic" exception entirely swallow the general rule that Section 10(b)

and Rule 10b-5 impose no affirmative duty to disclose any and all material information.

<u>Vivendi</u>, 838 F.3d at 239 (citing <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 44 (2011)).

For these reasons, this Court finds that River Birch has not alleged an actionable omission of

material fact, and the Section 10(b) and 10b-5 claims are dismissed.

    B.  <u>Scienter</u>

        As River Birch has failed to allege an actionable misstatement or omission of

material fact, this Court need not reach the scienter question.  However, even if River Birch had

succeeded on that front, the Complaint still does not adequately plead scienter.

        Under the PSLRA, the plaintiff must "state with particularity facts giving rise to a

strong inference that the defendant acted with the requisite state of mind."  15 U.S.C. § 78u-

4(b)(2).  "The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent to

deceive, manipulate, or defraud."  <u>ECA</u>, 553 F.3d at 198.  The inference must be "more than

merely plausible or reasonable—it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent."  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308,

313 (2007).  Where one of the defendants is a corporate entity, scienter is commonly pleaded by

alleging scienter for an individual whose intent can be imputed to the corporation.  <u>Teamsters</u>

<u>Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 195 (2d Cir. 2008).

Scienter may be adequately alleged either by "(1) showing that defendants had the motive and

opportunity to commit fraud; or (2) furnishing circumstantial evidence of conscious misbehavior

or recklessness." Nguyen, 297 F. Supp. 3d at 492 (citing ATSI, 493 F.3d at 99).  Defendants argue that River Birch has made neither of these required showings.

As a preliminary matter, where individual defendants hold prominent corporate positions such as CEO or CFO, a court presumes the opportunity to commit fraud.  Nguyen, 297 F. Supp. 3d at 493.  The plaintiff must then plead a "concrete and personal benefit" to demonstrate motive.  Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).

River Birch alleges that Defendants purposefully timed their November 2016 8-K disclosures to "break all of the bad news at once" to increase interest in the Parent Company Exchange Offer.  (Compl. ¶ 36.)  As a result, Jack Cooper Enterprises would reacquire its own notes at a discount.  (Compl. ¶ 36.)  Further, River Birch claims that Jack Cooper later sought to reacquire its own outstanding Notes at an unspecified time at a low price made possible by their drop in value following the November 2016 8-K disclosures.  (Compl. ¶ 37.)

Fundamentally, the Complaint fails to "point to the concrete benefits that could be realized" by the alleged scheme.  In re Iconix Brand Grp., 2017 WL 4898228, at *14 (S.D.N.Y. Oct. 25, 2017).  Though River Birch does not precisely articulate this point, Defendants could have theoretically waited to share the bad news so that its investors would be desperate to exchange their notes, which in turn would alleviate some of the company's outstanding debt. But this Court finds fraudulent intent less likely as Jack Cooper expressly disclosed in the November 2016 8-K that it hoped the Parent Company Exchange Offer would bring down its debt-to-EBITDA rate.  (See Compl. ¶ 35.)  And making misstatements or omissions "to protect the very survival of a company" is "too generalized a motive to plead securities fraud."  In re PXRE Grp., Ltd. Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009).

Moreover, the Complaint fails to allege how any concrete benefit would accrue to the Individual Defendants. For example, motive is often shown where "corporate insiders are alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108 (2d Cir. 2009). With no such profit or windfall alleged, this Court is ultimately left to speculate on why this scheme would serve Defendants' self-interest, as a mere desire to "keep their jobs" at a viable company does not give rise to a strong inference of scienter. In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010).

Because River Birch has not adequately pleaded motive and opportunity, it must instead rely on "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. "[T]he strength of the circumstantial allegations must be correspondingly greater if there is no motive." ECA, 553 F.3d at 199 (citation and quotation marks omitted). "Recklessness is defined as an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 348 (S.D.N.Y. 2011). River Birch alleges upon information and belief that "Jack Cooper's own financial projections throughout 2016 should have indicated that [a breach of the Covenant] was inevitable" and points specifically to Jack Cooper's 10.6x debt-to-EBITDA rate as of June 2016—well above the 3.3x level required at year's end. (Compl. ¶ 39.)

River Birch's reliance on this argument is flawed. First, regardless of the debt-to-EBITDA rate, there are no facts showing that anyone at Jack Cooper was aware of "deteriorating relationships" with other customers such that they could have been disclosed prior to November

2016.  Second, the facts do not suggest that any problems regarding the Covenant had

"escalate[d] [prior to November 2016] to the point where the dispute would unequivocally result

in termination."  <u>Express Scripts</u>, 2017 WL 3278930, at *18.  Without any facts showing a firm

likelihood of the worst-case scenario at an earlier juncture, the inference that Defendants'

behavior was wrong or reckless is weak.  <u>See In re Agnico-Eagle Mines Ltd. Sec. Litig.</u>, 2013

WL 144041, at *19 (S.D.N.Y. Jan. 14, 2013) (explaining that "knowing of problems, which are

common, differs from knowing that [the worst-case scenario will come to pass]" (citation and

quotation marks omitted)).

       And finally, regardless of the thinly sketched motives or circumstantial evidence

in the Complaint, the "opposing inference of nonfraudulent intent" is far more compelling.

<u>Tellabs</u>, 551 U.S. at 313.  For all of River Birch's <u>Sturm und Drang</u>, the alternate explanation for

Jack Cooper's actions is simpler.  Defendants believed that they could take measures to reduce

their debt-to-EBITDA rate, and even if they failed to do so, other existing pressures in their

industry and their positive attributes—<u>i.e.</u>, union ties, geographic reach, extensive experience—

might allow them to work out a deal with their customer.  Once the December 31, 2016 deadline

drew closer in November and the company's debt-to-EBITDA rate remained worrisome, Jack

Cooper responsibly disclosed the risk.  Judges in this district have repeatedly favored similar

inferences.  <u>See Express Scripts</u>, 2017 WL 3278930, at *19; <u>see also</u> <u>Agnico-Eagle Mines</u>, 2013

WL 144041, at *19 (explaining that "a gamble that bad news will eventually be obviated by a

change in circumstances may [sometimes] rise to the level of recklessness," but not where "the

facts alleged . . . most strongly support" the non-fraudulent explanation).  And it is just as

persuasive to assume that Defendants timely disclosed the loss of customer business because

those setbacks had occurred in the time between filings.

River Birch's remaining arguments are unavailing. The fact that Jack Cooper never disclosed the name of the customer implicated by the Covenant is irrelevant as the November 2016 8-K is not the source of any alleged misstatement or omission. And considering the weakness in the remainder of River Birch's scienter allegations, the already little weight accorded to executive resignations—here, Testman's—is of minimal import. In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005).

For all of the above reasons, River Birch has not adequately pleaded scienter, and accordingly, its Section 10(b) and Rule 10b-5 claims are dismissed.

III.     Section 20(a) Claims

In view of this Court's dismissal of River Birch's Section 10(b) and Rule 10b-5 claims, the Section 20(a) claim is also dismissed. See Steginsky v. Xcelera Inc., 741 F.3d 365, 371 (2d Cir. 2014).

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. The Complaint is dismissed with prejudice, as this Court previously informed River Birch during pre-motion proceedings that leave to replead would not be granted if Defendants prevailed on this motion.[2] The Clerk of Court is directed to terminate the motion pending at ECF No. 41 and to mark this case as closed.

Dated:  March 8, 2019                                        SO ORDERED:
        New York, New York

                                                            _____
                                                            WILLIAM H. PAULEY III
                                                            U.S.D.J.

---

[2]     See DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 556–57 (S.D.N.Y. 2018) (citation and quotation marks omitted) ("Courts have dismissed claims with prejudice on the basis that the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies.").